# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SHAWN BARMORE, JR., | ) |
| Plaintiff, | ) |
| v. | ) 13-cv-1500 |
| DR. ANTHONY DUBRICK, | ) |
| DR. IMHOTEP CARTER, | ) Judge John Z. Lee |
| DR. SALEH OBAISI, | ) |
| and WEXFORD HEALTH | ) |
| SOURCES, INC., | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Shawn Barmore, Jr., an inmate at Stateville Correctional Center, brought this action under 42 U.S.C. § 1983 against three prison physicians—Dr. Anthony Dubrick, Dr. Imhotep Carter, and Dr. Saleh Obaisi—claiming that they were deliberately indifferent to his hernia-related pain in violation of the Eighth Amendment. Barmore is also suing the corporation contracted to provide medical care to inmates at Stateville, Wexford Health Sources, Inc. He contends that Wexford's hernia treatment policy caused him to receive constitutionally deficient treatment. Defendants have filed a motion for summary judgment, asserting that Barmore's claim constitutes nothing more than a disagreement with the doctors' medical judgment about the appropriate course of treatment. For the reasons given below, Defendants' motion is denied.

## Factual Background

Defendant Wexford Health Sources, Inc. is a medical contractor that provides medical services to inmates at Stateville Correctional Center. Defs.' SOF ¶ 12. Defendant Anton Dubrick is a physician who was employed by Wexford at Stateville. *Id.* ¶ 9. Defendant Imhotep Carter is also a physician who was employed by Wexford employee at Stateville, where he served as the medical director until May 2012. *Id.* ¶¶ 9–10. Defendant Saleh Obaisi is a physician and Wexford employee who became the medical director at Stateville in August 2012. *Id.* ¶ 11.

Barmore entered Stateville in 2004. In 2011, he complained to prison medical staff of swelling on his side. *Id.* ¶ 15. The following month, a physician's assistant, Latonya Williams, twice examined Barmore because of his complaints of swelling and pain. *Id.* ¶¶ 16–17. Following the second examination, Williams diagnosed Barmore with a non-incarcerated, non-tender, reducible right inguinal hernia. *Id.* ¶ 17. Williams prescribed Tylenol for pain and Metamucil (a fiber supplement) to reduce the strain on Barmore's bowels. *Id.* ¶¶ 17–18. Barmore understood from Williams that, because his hernia was "reducible," it might repair itself over time. In fact, a reducible hernia is one that can be pushed back into the abdominal cavity temporarily. Defs.' Ex. E, Obaisi Dep., at 13. An inguinal hernia, which is what Barmore was diagnosed with, can be expected to grow over time rather than heal. *Id.* at 20.

From March 2011 until February 2012, Barmore did not complain of hernia-related pain to any prison personnel, nor did he request to see health care providers

for any issue related to his hernia. Defs. SOF ¶¶ 22–30. He explains that he was patiently waiting to see if his hernia would heal or improve. Defs.' Ex. B, Barmore Dep., at 24. During this period, Barmore sometimes played basketball and, until October 2011, he worked at his prison job assignment, sweeping and mopping the floors and galleries. Defs.' SOF ¶ 23; Pl.'s Resp. Defs.' SOF ¶ 23.

Barmore returned to the health care unit again on February 9 and February 21, 2012, and was again evaluated by Williams. According to her treatment notes, he complained that his hernia was "acting up," Defs.' Ex. F, IDOC Medical Records, at 20, and reported that "the Metamucil didn't really work." *Id.*; Defs.' SOF ¶ 33. He also reported that the pain "hasn't gone away," and "I can't even play basketball or work out because of the pain." Defs.' Ex. F, IDOC Medical Records, at 20–21. Williams prescribed Barmore Metamucil and Tylenol once more, and she referred him to Dr. Dubrick for a second opinion. *Id.*; Defs.' SOF ¶ 33.

Dubrick examined Barmore on February 24, 2012. Defs.' SOF ¶ 34. Barmore, Dubrick acknowledges, reported that the pain caused him "trouble sleeping" and "bending over." Defs.' Ex. B, Barmore Dep., at 19, 56. Dubrick diagnosed Barmore with a right inguinal hernia that was "easily reducible when supine," and noted that Barmore suffered from "longstanding pain" related to this hernia. Defs.' Ex. F, IDOC Medical Records, at 22. Barmore does not dispute that his hernia was reducible when he was lying flat on his back, but he did testify that, as early as 2011, the hernia could not be pushed into place when he was standing. *See* Defs.' Ex. B, Barmore Dep., at 26–30.

Dubrick's notes go on to say that Barmore's hernia likely would be repaired surgically as a comfort measure if Barmore were not in prison and had health insurance. Defs.' Ex. F, IDOC Medical Records, at 22; Pl.'s SOAF ¶¶ 3–4. But the hernia simply did not meet the criteria of Wexford's hernia policy for surgical repair. *Id.* That policy, according to Dubrick, allowed surgery only if the hernia was strangulating the bowel (which would call for emergency surgery) or if it was non-reducible *and* had become so large it was a significant source of pain or disability for the patient. Defs.' Ex. D, Dubrick Dep., at 12; Pl.'s SOAF ¶ 7.

Barmore testified that Dubrick told him he would not recommend surgery despite his pain and despite that the hernia "may have grown." Defs.' Ex. B, Barmore Dep., at 20. Dubrick also, according to Barmore, went so far as to tell him that he would need to file a lawsuit in order to get surgery. *Id.* at 55. Defendants dispute Barmore's account, however, and they assert that Dubrick's determination was based on his clinical evaluation of Barmore's hernia, rather than any reliance on Wexford's policy. Defs.' LR 56.1(a)(3) Stmt. ¶¶ 35–36.

After Dubrick declined to recommend surgery, Barmore filed a grievance in which he described the intensity of his pain and the pain's interference with his ability to function normally. Defs.' Ex. A, Complaint, at Compl. Ex. A, Grievance of 2/26/12. Possibly as a result of Barmore's grievance, he was permitted to see Dr. Carter, the medical director, on April 16, 2012. Barmore testified that he told Carter his hernia had increased in size and become more painful. Defs.' Ex. B, Barmore Dep. at 20. But Carter, like Dubrick before him, determined that Barmore

was not a candidate for surgery. Defs.' SOF ¶¶ 37–38. Barmore recounts that Carter explained, as Dubrick had, that Wexford would not pay for his hernia to be surgically repaired. Defs.' Ex. B, Barmore Dep. at 20. Defendants dispute that this was Carter's reasoning, contending that Carter weighed the risks and benefits of surgical repair and concluded that surgery was not medically indicated. Defs.' SOF ¶ 38. Barmore, however, testified that Carter never attributed his decision to the risks of surgery. Defs.' Ex. B, Barmore Dep., at 37.

In addition to the Tylenol and Metamucil that Barmore was already receiving, Dr. Carter prescribed him a hernia belt. Defs.' SOF ¶¶ 37–39. A hernia belt does not repair a hernia. It can provide some comfort by holding the protruding intestine in place, but its main function, according to Carter, is to remind the patient to be careful of the hernia. Defs.' Ex. C, Carter Dep., at 21–22. Carter testified that the belt was to be worn only when the hernia was causing Barmore discomfort. *Id.* at 27.

Over five months passed after Carter prescribed the hernia belt for Barmore, yet no hernia belt arrived. Barmore then filed a grievance asking for it. Defs.' Ex. B, Barmore Dep., at 71; Defs.' Ex. A, Complaint, at Compl. Ex. H, Grievance 10/4/12. He explained in the grievance that his hernia was causing him "extreme pain." Defs.' Ex. A, Complaint, at Compl. Ex. H, Grievance 10/4/12.

On November 9, 2012, Barmore received the hernia belt. Defs.' SOF ¶ 43. Ten days later, he was examined by Dr. Obaisi, who had replaced Carter as medical director. *Id.* ¶ 45. Obaisi's notes indicate that Barmore had a reducible right

5

inguinal hernia that was occasionally painful. *Id.* Obaisi prescribed Barmore Motrin 400 mg for pain and Konsyl, a fiber supplement that is equivalent to Metamucil. *Id.*

Obaisi, like Dubrick and Carter, refused to recommend surgery. According to Obaisi, his determination that Barmore was not a candidate for surgery was based on Barmore's subjective complaints, objective findings, and consideration of Wexford's policy, which he said was merely a guide. Defs.' Ex. E, Obaisi Dep., at 18. But Barmore testified that Wexford's unwillingness to pay for the surgery was the reason that Obaisi gave for not recommending it. *Id.* at 17–18.

Obaisi's notes indicate that Barmore was not wearing his hernia belt during the appointment. Defs.' Ex. F, IDOC Medical Records, at 26. Obaisi apparently did not ask him why, and Barmore did not volunteer an explanation. Defs.' Ex. B, Barmore Dep., at 62–64. Barmore has since explained that the belt was uncomfortable and provided no pain relief, possibly because his hernia actually was not reducible. *Id.* at 64. He nevertheless tried to use the belt on and off for about two months. *Id.* at 65. The reason he did not complain to any Wexford employee about the hernia belt's inefficacy after those two months was that he had become convinced, following Obaisi's refusal to recommend surgery, that no one from Wexford would do anything to help him. *Id.* at 63.

On February 26, 2013, Barmore filed this lawsuit, claiming that Defendants' refusal to refer him for a surgical consultation violated the Eighth Amendment. He requested injunctive relief—that Wexford be ordered to provide surgery—and damages.

Barmore did not make any other official complaints of hernia-related pain until March 3, 2014, when he presented to sick call, complaining of hernia pain. Defs.' SOF ¶¶ 47–48. (At that point, this lawsuit was well under way, and he had testified at length in his deposition about his ongoing pain.) Obaisi examined him on March 13 and, although he still evaluated the hernia as reducible, he recommended a surgical consultation, pending collegial review. *Id.* ¶ 49. Obaisi testified that, while Barmore's condition had not changed dramatically since November 2012, he felt that Barmore's worsening pain warranted sending him to see a general surgeon for evaluation. *Id.*

Dr. Obaisi received approval to send Barmore out for a surgical evaluation, and Plaintiff was referred to Dr. Shishin Yamada, general surgeon at Silver Cross Hospital. *Id.* ¶¶ 51–52. Dr. Yamada assessed Plaintiff to have a recurrent right inguinal hernia with some incarceration and recommended elective inguinal hernia repair. *Id.* ¶ 52. On June 24, 2014, surgery was approved in collegial review, and on July 18, 2014, Barmore's hernia was surgically repaired. *Id.* ¶¶ 54–55.

## Analysis

Defendants have moved for summary judgment. A motion for summary judgment will be granted only if the evidence shows that there is no genuine dispute of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party, which means giving that party "the benefit of conflicts in the

evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir.2013).

## I.   Plaintiff's Claim for Injunctive Relief

Because Barmore underwent a right inguinal hernia repair in 2014, he no longer seeks injunctive relief. Resp. Br. at 1, ECF No. 79. Accordingly, Plaintiff's claim for injunctive relief is dismissed as moot.

## II.   Individual Defendants

Barmore claims that Dubrick, Carter, and Obaisi's treatment of his hernia violated his right under the Eighth Amendment to be free from cruel and unusual punishment. The Eighth Amendment, applicable to the states through the Due Process Clause of the Fourteenth Amendment, protects incarcerated persons from "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104–105 (1976). "The burden is on the prisoner to demonstrate that prison officials violated the Eighth Amendment, and that burden is a heavy one." *Pyles v. Fahim*, 771 F.3d 403, 408–09 (7th Cir. 2014). For a prisoner to establish deliberate indifference based on deficient medical care, a plaintiff must show: (1) an objectively serious medical condition, and (2) that the defendants were deliberately indifferent to this condition. *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015).

Defendants concede for purposes of their motion that Barmore's hernia constituted an objectively serious medical condition, Mem. Supp. Summ. J. at 3, and the Seventh Circuit has recognized that a painful inguinal hernia, even if reducible, is likely to be objectively serious, *see Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th

8

Cir. 2011).[1] Thus, the only issue is whether Barmore has put forward evidence from which a rational jury could conclude that Defendants were deliberately indifferent to that serious condition.

Delaying treatment of a non-life threatening—but painful—condition for nonmedical reasons can constitute deliberate indifference. *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). This is true even if the delay in treating does not exacerbate the injury. *Smith v. Knox Cty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012). Whether a prison official was deliberately indifferent depends, however, on his subjective state of mind. *Petties v. Carter*, No. 14-2674, 2016 WL 4631679, at *3 (7th Cir. Aug. 23, 2016). To be liable, the official must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists"

---

[1] The Seventh Circuit also explained that surgery is the standard response for a reducible but painful inguinal hernia:

> Inguinal hernias are common among men, and approximately 750,000 surgical repairs are performed each year in the United States. *See* Andrew Kingsnorth, *Treating Inguinal Hernias*, 328 Brit. Med. J. 59 (2004). According to the National Institutes of Health, "surgery will usually be used for hernias that are getting larger or are painful" and is the only treatment that can permanently fix a hernia. *See* Medline Plus, Hernia, http://www.nlm.nih.gov/medlineplus/ency/ article/ 000960.htm (last visited Nov. 29, 2011); *see also* Robert J. Fitzgibbons Anita Giobbe-Hurder, *Watchful Waiting vs Repair of Inguinal Hernia in Minimally Symptomatic Men*, 295 J. Am. Med. Assoc. 285 (2006); Mayo Clinic, Inguinal Hernia, http://www.mayoclinic.com/health/inguinal-hernia/ DS00364 (last visited Nov. 29, 2011). While surgery can be postponed, delay is recommended only for patients with minimal or no symptoms, and then "only if the hernia can be reduced readily and completely and will remain in position despite physical activity." Kingsnorth, *supra* at 59.

*Gonzalez*, 663 F.3d at 315.

and must also have actually drawn that inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

But even if a defendant denies having been aware of a substantial risk of serious harm, summary judgment is inappropriate when a reasonable jury could conclude from other evidence in the record that the defendant was in fact aware of the risk. "When a doctor says he did not realize his treatment decisions (or lack thereof) could cause serious harm to a plaintiff, a jury is entitled to weigh that explanation against certain clues that the doctor did know." *Petties*, No. 14-2674, 2016 WL 4631679, at *5 (denying summary judgment to defendant doctors who denied knowing that failure to immobilize plaintiff's ruptured Achilles tendon exacerbated the injury). And although simple disagreement with a doctor's medical judgment is not evidence of deliberate indifference, the doctor's decision to persist in a course of treatment he knows to be ineffective—when reasonable alternatives are available—does constitute deliberate indifference. *Id.*; *Greeno*, 414 F.3d at 655; *Garvin v Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001). The upshot is that, "where evidence exists that the defendants knew better than to make the medical decisions that they did, a jury should decide whether or not the defendants were actually ignorant to risk of the harm that they caused." *Petties*, No. 14-2674, 2016 WL 4631679, at *5.

Defendants argue in support of their motion for summary judgment that Barmore has not put forward evidence from which a jury could conclude that they were deliberately indifferent to his medical needs. In their view, Barmore simply

disagreed with Defendants' medical judgment about the proper course of treatment. Defs.' Mem. Supp. Summ. J. at 5–6. They detail the treatment Barmore did receive, and they contend that the record shows Dubrick, Carter, and Obaisi all believed surgery was not indicated before March 2014, when Obaisi referred him for a surgical consultation. *Id.* at 3–8.

As explained in more detail below, the Court, viewing the evidence in the light most favorable to Barmore, concludes that a reasonable jury could find that all three doctors were deliberately indifferent to his hernia pain, which constituted a serious medical need. The jury could conclude that the doctors each believed that surgery was indicated but refused to recommend it—until Barmore sued.

### A. Dr. Dubrick

Defendants argue that Dr. Dubrick undeniably provided Barmore with prompt and comprehensive care for his hernia, meaning he could not have been deliberately indifferent to Barmore's serious medical need. Mem. Supp. Summ. J. at 5–6. Barmore may have preferred surgery, they acknowledge, but Dubrick used his medical judgment to determine that surgery was not warranted.

It is true that "neither medical malpractice nor disagreement with a doctor's medical judgment amounts to deliberate indifference," *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005), but Barmore responds that he is not disagreeing with Dubrick's medical judgment. Rather, he argues that the evidence would allow a reasonable jury to find that Dubrick denied Barmore surgery despite both knowing of his pain and holding the belief that surgery was the proper treatment. Resp. Br. at 6–8.

11

If Barmore is right that a reasonable jury could find Dubrick knew of Barmore's hernia pain and also believed that surgery, which was reasonably available, was the proper course of treatment, then Barmore's claim against Dubrick must go forward. *See Gonzalez*, 663 F.3d at 314 (a defendant's refusal to recommend surgical repair of painful inguinal hernia despite professional judgement that surgery was indicated constitutes deliberate indifference). Barmore is not required to establish that Dubrick "literally ignored" his medical needs in order to prevail on a deliberate indifference claim. *Petties*, No. 14-2674, 2016 WL 4631679, at *3. He need only show that Dubrick knew the treatment he provided was inadequate in light of the severity of the condition and accepted professional standards. *Perez*, 792 F.3d at 777.

The Court finds that there is a genuine dispute of material fact as to whether Dubrick failed to alter Barmore's treatment despite knowing that the prescribed treatments were ineffective. Certainly Barmore has presented evidence from which a reasonable jury could conclude that Dubrick knew that Tylenol and Metamucil were not effectively treating Barmore's pain. Barmore has testified that he told Dubrick as much, *see* Defs.' Ex. B, Barmore Dep., at 18–19, and the grievance Barmore filed after seeing Dubrick, in which he complains about his ongoing pain, provides some corroboration for his testimony that he reported uncontrolled pain to Dubrick, Defs.' Ex. A, Complaint, at Compl. Ex. A, Grievance of 2/26/12.

A reasonable jury also could find that Dubrick's reasons for not recommending surgery were nonmedical. *See Duckworth v. Ahmad*, 532 F.3d 675,

679 (7th Cir. 2008) (jury can infer deliberate indifference when doctor's decision not based on a medical judgment). Barmore testified that, after he complained of serious pain, Dubrick acknowledged that his hernia "may have grown" but told him he could not recommend surgery "due to the fact that Wexford is not going to pay for it." Defs.' Ex. B, Barmore Dep., at 18, 55. Dubrick also reportedly stated, "You need to file your lawsuit or do whatever you [are] going to do" in order to receive the surgery. *Id.* at 55. And Dubrick's progress notes provide corroboration for parts of Barmore's story. Dubrick wrote that the hernia "likely would be repaired as a comfort measure outside prison if patient had insurance. However, [the hernia] does not meet Wexford criteria for repair." Defs.' Ex. F, IDOC Medical Records, at 22.

In sum, a reasonable jury could find that Dubrick chose to leave Barmore in pain needlessly, which constitutes deliberate indifference to Barmore's serious medical need. Summary judgment is therefore denied as to Dr. Dubrick.

### B. Dr. Carter

In April 2012, a month after Dubrick examined Barmore (and after Barmore filed a grievance), Dr. Carter, the then-medical director at Stateville, examined Barmore. Carter also declined to recommend surgery. Defs.' SOF ¶ 37. Instead, he continued the prescription for Tylenol and Metamucil, and he prescribed a hernia belt. *Id.* Barmore testified that Carter attributed his refusal to recommend surgery not to his own judgment but to his belief that Wexford would be against it, saying that the "hernia is too small for our insurance company" and "Wexford is not going to pay for that surgery." Defs.' Ex. B, Barmore Dep., at 20, 57. Barmore also stated

13

that Carter explained that "there is nothing we can do" (apparently regardless of pain) because the hernia, in Carter's assessment, was reducible. *Id.* at 57.

Defendants argue that Carter is entitled to summary judgment, asserting that he provided Barmore with prompt and comprehensive care. Mem. Supp. Summ. J. at 6. Carter testified at his deposition that his determination not to recommend surgical repair of Barmore's hernia was based solely on his medical assessment of the risks and benefits of surgery. Defs.' SOF ¶¶ 37–38. Carter recounted that, after reviewing Barmore's medical history, he "came to the conclusion that there was no medical indication for [surgery]." Defs.' Ex. C, Carter Dep., at 17–18. Carter also denied telling Barmore that he could not recommend surgery because of Wexford, testifying that Wexford "did not have a specific guideline or set of policies regarding the management of a hernia" or a "specific manual on how to manage individual illnesses." *Id.* at 18–19. Therefore, Defendant's contend, Barmore's objection to Carter's decision is nothing more than a disagreement with Carter's professional judgment. Defs.' SOF ¶¶ 37–38; *see Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ("disagreement with a doctor's course of treatment is generally insufficient" to establish an Eighth Amendment violation).

The Court concludes that there is a genuine dispute in the record over Carter's reason for not recommending surgery. A reasonable jury might believe Carter's account, but at the same time a reasonable jury could find to the contrary that Carter had a nonmedical reason for refusing to send Barmore out for a surgical

consultation. According to Barmore, Carter told him that surgery was not an option because Wexford would not pay for it, explaining "there is nothing we can do." Defs.' Ex. C, Carter Dep., at 57. A jury could infer from these statements that Carter was not basing his decision on his own medical judgment, and deliberate indifference can be inferred from prison physician's refusal for nonmedical reasons to send a patient to outside specialists. *See Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011).

Although Carter, by prescribing the hernia belt, ostensibly made some alteration in Barmore's treatment in response to his complaints of pain, this fact does not defeat the possibility that Carter was deliberately indifferent. *See Greeno*, 414 F.3d 645, 654 ("[D]efendants' contention that [Plaintiff's] claim fails because he received *some* treatment overlooks the possibility that the treatment . . . was so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition."). A reasonable jury could conclude that Carter did not even bother to order the belt after prescribing it. The only evidence in the record on that question suggests that Barmore received the belt only because he complained and filed a grievance. And a reasonable jury also could find that Carter prescribed the belt because Wexford's policy allowed it (unlike surgery), rather than because he believed the belt was an appropriate treatment for Barmore's condition. As Carter himself testified, the main purpose of the hernia belt was simply to remind Barmore of the hernia's presence. Defs.' Ex. C, Carter Dep., at 21–22. Accordingly, the Court denies Defendants' summary judgment motion as to Dr. Carter.

15

### C. Dr. Obaisi

Dr. Obaisi took over as medical director at Stateville on August 2, 2012. Defs.' Ex. E, Obaisi Dep., at 10. In October 2012, Bamore filed a grievance requesting that he either be given the hernia belt prescribed by Carter or referred out for surgery. Defs.' Ex. A, Complaint, at Compl. Ex. H, Grievance of 10/4/12. Barmore received the belt on November 9. Defs.' SOF ¶¶ 43. Ten days later, Obaisi examined Barmore's hernia, observing that it was "occasionally painful." *Id.* ¶ 45. He refused to recommend surgery, but he prescribed Motrin and Konsyl, a fiber supplement like Metamucil. *Id.* Obaisi apparently did not ask Barmore any questions about his use of the hernia belt. Defs.' Ex. B, Barmore Dep., at 62–64.

Fifteen months later—a year after this lawsuit began—Barmore saw Obaisi again about his painful hernia. At that time, Obaisi referred him for surgical evaluation, though in Obaisi's estimation little had changed in Barmore's condition since 2012. Defs.' SOF ¶¶ 48–49; Defs.' Ex. E, Obaisi Dep., at 20.

Defendants argue that Obaisi was not deliberately indifferent to Barmore's serious medical need. Mem. Supp. Summ. J. at 7–9. Rather, Defendants contend, Obaisi provided the treatment he thought appropriate in November 2012, and he only recommended surgery in 2014 after concluding that Barmore's condition had worsened. *Id.* They stress that Barmore reported for the first time in 2014 that his pain was an "8 out of 10." *Id.* at 8. They add that Barmore did not wear his hernia belt regularly, and they also stress that there was a fifteen-month gap between Barmore's two visits to Obaisi. *Id.* at 7. Additionally, they place great emphasis on

16

the fact that the surgery Barmore ultimately received was "elective." Reply Br. at 7–8.

Although a reasonable jury could find that Obaisi was not deliberately indifferent to Barmore's serious medical need, a reasonable jury could just as easily find the opposite. Remember that Barmore, by the time he saw Obaisi in November 2012, had already seen a physician's assistant and two other doctors about his hernia, and he was still complaining of uncontrolled pain. Obaisi, however, flatly refused to send him out for a surgical consultation. Defs.' Ex. B, Barmore Dep., at 17–18, 62–63. And Obaisi also—at least according to Barmore—attributed his decision to Wexford rather than to his own medical judgment. *Id.* Only after Barmore filed this lawsuit in 2013 and counsel was recruited for him did Obaisi change course and send Barmore out for a surgical consultation. *See* Defs.' SOF ¶¶ 49, 51 (surgical consultation ordered on April 2, 2014). He ordered the consultation despite that he assessed Barmore's condition to be largely unchanged from 2012, *see id.* ¶ 49, which (along with other evidence) would allow an inference that Obaisi actually had believed in 2012 that surgery was indicated. Although Defendants place stock in Barmore's 2014 rating of his pain as 8 out of 10, they provide no earlier pain rating for comparison, and there is evidence that Barmore was suffering from serious pain much earlier. *See, e.g.*, Defs.' Ex. A, Compl. at Compl. Ex. A, Grievance of 2/26/16.

A reasonable jury could also infer that Obaisi did not believe the hernia belt was likely to be an efficacious treatment for Barmore's condition. Obaisi did not

17

himself prescribe the belt—Carter did—and Obaisi's apparent failure to ask Barmore anything about the belt's efficacy suggests that he did not expect much from it (or simply did not believe it relevant).

Additionally, Defendants' reliance on the fifteen-month gap between visits as evidence that Barmore was not suffering ignores that Barmore filed this lawsuit during that time period and gave a deposition in which he described his intense pain. And, finally, the emphasis Defendants place on the designation of Barmore's surgery as "elective" is misplaced. Elective surgery is simply surgery that is scheduled in advance because it is not required by an emergency. *See* Vol. 2 CH-F, J.E. Schmidt, M.D., *Attorneys' Dictionary of Medicine* (2015) at E-40.2 (defining "elective operation" as a "non-emergency operation performed at a time selected by the surgeon and/or patient").

In short, Barmore has established a genuine dispute of fact as to Obaisi's reason for denying him surgery in 2012. A reasonable jury could conclude that Obaisi was deliberately indifferent to Barmore's serious medical need; thus, summary judgment is denied.

### III. Corporate Defendant Wexford Health Sources, Inc.

A corporation that has contracted to provide prisoners with medical care can be liable under § 1983 if its policy or practice has been the "direct cause" or "moving force" behind a violation of the plaintiff's constitutional rights. *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927–28 (7th Cir. 2004) (standard for municipal liability of *Monell v. New York City Department of Social Services*, 436

U.S. 658, (1978), applies to corporations as well). Barmore claims that Wexford's policy on hernia repair caused his constitutional rights to be violated.

Although each defendant in this case, including Wexford, has moved for summary judgment, Defendants' motion and memorandum in support include no arguments in favor of summary judgment for Wexford. This is despite the Court's earlier order recognizing that Barmore had stated a policy claim against Wexford. *See* Order of 3/26/13, ECF 7.

Defendants instead argue for the first time in their reply brief that Wexford does not have an unconstitutional policy. But an argument for summary judgment is forfeited if it is made for the first time in a reply brief. *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009). As a result, the Court need not address Defendants' arguments about Wexford.

Nevertheless, the Court notes that a recent case involving Wexford's hernia repair policy, *Wilder v. Wexford Health Sources, Inc.*, No. 11-C-4109, 2015 WL 2208440 (N.D. Ill. May 8, 2015), is directly on point. In *Wilder*, the court denied Wexford's summary judgment motion because: (1) the plaintiff had presented evidence "sufficient to allow a reasonable factfinder to conclude that Plaintiff was not given surgery due to Wexford's policy," and (2) a reasonable jury could find that "Wexford's policy did not provide for the consideration of Plaintiff's pain level." *Wilder*, 2015 WL 2208440, at *10–*11. The same is true in this case. Like the plaintiff in *Wilder*, Barmore has presented evidence from which a reasonable jury could find that Dubrick, Carter, and Obaisi were following Wexford's policy when

19

they chose not to recommend surgery. Although that policy, as described by Dubrick, accounted for a patient's pain level to some extent, it did so only for nonreducible hernias. Defs.' Ex. D, Dubrick Dep. at 12–14. A painful-but-reducible hernia would not be a candidate for surgical repair under the policy. But a delay in the treatment of painful, non-life threatening conditions can violate the Eighth Amendment. *See Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008). Accordingly, Wexford's motion for summary judgment is denied.

## Conclusion

For the reasons stated herein, Defendants' motion for summary judgment is denied in its entirety. A status hearing will be held on 9/27/16 at 9:00 a.m. The parties should be prepared at the hearing to set deadlines for pretrial filings and a date for the pretrial conference and trial.

**IT IS SO ORDERED.**               ENTERED   9/12/16

*[signature]*

_____

**John Z. Lee**
**United States District Judge**